1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7   MAMIE BROWN,                              Case No.  13-cv-04213-JCS

              Plaintiff,

8

        v.                                    **ORDER GRANTING MOTION FOR**
9                                             **SUMMARY JUDGMENT AND**
                                              **DENYING AS MOOT MOTION TO**
10  CITY AND COUNTY OF SAN                    **STRIKE**
    FRANCISCO DEPARTMENT OF PUBLIC
    HEALTH,                                   Re: Dkt. No. 42, 64
11
              Defendant.
12

13  **I.     INTRODUCTION**

14          Plaintiff Mamie Brown, an African American woman, is a longtime employee of

    Defendant City and County of San Francisco, Department of Public Health ("SFDPH").  This case
15
    arises from incidents that Brown contends constitute unlawful discrimination, retaliation, and
16
    harassment.  Defendant has moved for summary judgment as to each of Brown's seven claims,
17
    arguing primarily that the record indicates Brown cannot present evidence on which a rational jury
18
    could find in her favor.  The Court held a hearing on November 14, 2014 and has considered the
19
    parties' arguments.  Based on the record that the parties have submitted, the Court agrees that
20
    there is insufficient evidence to create a genuine issue of fact for trial.  Accordingly, for the
21
    reasons discussed below, Defendant's Motion is GRANTED.  Defendant also filed a Motion to
22
    Strike Brown's Supplemental Declaration, which the Court DENIES AS MOOT.[1]
23

24  **II.    BACKGROUND**

25          **A.     Complaint**

26          Brown's First Amended Complaint ("FAC" or "Complaint") alleges that upon transferring

27  _____

28  [1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28
    U.S.C. § 636(c).

to her present unit at San Francisco General Hospital ("SFGH") in May or June of 2009, she "began being subject to a pattern of egregious, unrelenting, unlawful discriminatory employment practices by and with the consent of her Filipino supervisors." FAC ¶ 7−8.  It recounts a July 2009 incident in which a nurse manager cut Brown's personal lock off of Brown's locker, and alleges that Brown "has been continuously subjected to hostile and humiliating conduct and verbal abuse by Filipino supervisors and co-workers" since that incident. *Id.* ¶¶ 9−10.  According to the Complaint, Brown's coworkers "have expressed that they do not want a Black person working among them, while often speaking in Tagalog and mocking" her. *Id.* ¶ 10.  Brown alleges that the offending conduct includes "Unfair scheduling of assignments," "Unfair floating throughout all wards," "Denial of sick pay," "Denial of holiday pay," and "Denial of pay." *Id.* ¶ 11.

Based on these core factual allegations, Brown brings seven claims for relief.  The first three are for discrimination, retaliation, and harassment (creation of a hostile work environment) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, 2000e-3. FAC ¶¶ 12−29. The fourth claim is for discrimination under 42 U.S.C. § 1981, which provides for equal rights in the making, enforcement, and performance of contracts. FAC ¶¶ 30−34.  Brown's final three claims are for discrimination, retaliation, and harassment under California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §§ 12940(a), (h), (j), echoing her Title VII claims. FAC ¶¶ 35−53.

## B.    Factual Background

Brown has been employed as a patient care assistant ("PCA") at SFGH, a part of SFDPH, since October 2008.  Brown Decl. (dkt. 53) ¶¶ 3−4.  She assists nurses in caring for patients, including feeding, dressing, and bathing patients, walking and talking with patients, and taking vital signs.  Brown Dep.[2] 17:1−10.  She previously worked in the same role, which at the time was known as a certified nursing assistant, at Laguna Honda Hospital, also a part of SFDPH, starting in 1994.  *Id.* 17:25−18:7; Brown Decl. ¶ 3.  Brown's supervisor is Nurse Manager Edna Paredes, but she also works with one or more charge nurses on any given night.  Brown Dep. 19:14−20:5.

[2] Brown's deposition is filed as exhibits A and B to the declaration of Amy Super, at docket number 43.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Brown is African American.  Brown Decl. ¶ 2.

2         Brown alleges that, after transferring to unit 4A at SFGH in 2009, she was subject to

3    discrimination by her Filipina coworkers and supervisors.  *Id.* ¶ 9.  She focuses on the following

4    incidents.

5         First, Brown claims that she was subjected to "[u]nfair scheduling of assignments."  FAC

6    ¶ 11(a).  In her deposition, Brown described one incident in which she had been assigned as a

7    "sitter" or "coach" to a high-risk patient, but the charge nurse reassigned Brown to cover several

8    rooms on the other side of the unit and gave the "sitter" assignment to Brown's Filipina coworker.

9    Brown. Dep. 32:22−33:21.  Brown stated that her coworkers laughed at her, and that she believed

10   the incident was related to race because Brown was the only African American working in the

11   unit.  *Id.* 33:23−34:8.  She stated that there were no other incidents of unfair scheduling.  *Id.*

12   34:9−12.

13        Second, Brown claims that she experienced "[u]nfair floating throughout all wards."  FAC

14   ¶ 11(b).  "Floating" refers to the practice of temporarily reassigning staff from their normal units

15   to other units in need of additional help. See Brown Dep. 26:9-12; Ponferrada Decl. (dkt. 42-4)

16   ¶ 5.  Brown stated in her deposition that she was the first person in her unit required to float, and

17   that her Filipina coworkers did not begin floating until "six or seven months after that."  Brown

18   Dep. 38:19−40:5, 43:10−12.  According to Brown, she floated almost every day she worked

19   during that six to seven month period, *id.* 40:6−9, and she was able to see on her coworkers'

20   schedules that they were not floating, *id.* 43:7−44:12.  Defendant produced evidence that floating

21   was a standard practice at SFGH and that other employees floated during the same period as

22   Brown.  Paredes Decl. (dkt. 42-3) ¶¶ 4−5 & Ex. A; Ponferrada Decl. ¶¶ 5−6.  Brown stated in her

23   Declaration that Defendant's evidence on this subject is inaccurate.  Brown Decl. ¶¶ 30−33,

24   36−37.

25        Brown described an incident that occurred while she was floated to unit 4B, in which she

26   was forced to wait for an extended period to obtain assistance moving a large patient and then later

27   treated unkindly by a charge nurse.  Brown Dep. 34:18−36:14.  She believes the incident was

28   related to her race because she was the only African American working in unit 4B that night.  *Id.*

3

37:1−6.  She also recounted one night where she was floated to four different units, each of which then told her she was not needed.  *Id.* 46:1−47:1.  Brown is not aware of any other employee being floated to four units in one night.  *Id.* 47:17−18.

Third, Brown claims that she experienced "[d]enial of sick pay," FAC ¶ 11(c), on one incident where the acting nurse manager refused to grant an exception when Brown did not have enough sick time remaining to cover a night when she had to leave work due to illness.  Brown Dep. 48:6−49:6.  Brown believes this incident was related to her race because a coworker told her that the same supervisor had granted the coworker an exception under similar circumstances.  *Id.* 49:22−50:21.  The exact nature of the exception Brown sought is unclear:  Brown first described it as a request to "subsidize[] a floating day for a sick day," *id.* 48:17, and later in the deposition said that she wanted to treat the sick day as a vacation day, *id.* 99:14−21, but in her declaration stated that she "never sought to substitute vacation time for sick time," Brown Decl. ¶ 50.

Fourth, Brown claims that she experienced "[d]enial of holiday pay," FAC ¶ 11(d), when she did not receive holiday pay for working on Veterans Day in 2012.  Brown Dep. 51:1−14.  Brown believes this was related to her race because "everybody else got paid."  *Id.* 51:25−52:4.  Her belief that other employees were paid is based on talking to one coworker named Pat who said that she was paid for that Veterans Day.  *Id.* 52:8−12.  Defendant submitted a declaration of Martha Espana, chief payroll and personnel clerk for SFGH, stating that Brown was not paid for Veterans Day in 2012 because she was not scheduled to work (and did not work) that day, and that Brown instead received holiday hours that could be applied to a different day that she was scheduled to work.  Espana Decl. (dkt. 42-2) ¶ 4.  Brown stated in her declaration that Espana's statement is incorrect, and that Brown in fact was scheduled to work and did work on Veterans Day in 2012.  Brown Decl. ¶ 53.

Brown described a number of other incidents that she attributed to discrimination.  In one such incident, Brown claims that Nurse Manager Margo Dextrase-Cordova cut Brown's personal lock off of Brown's locker at SFGH in July 2009.  Brown Dep. 55:2−16; Brown Decl. ¶ 10.  Dextrase-Cordova was Brown's supervisor at the time.  Brown Dep. 28:3−19.  In her deposition, Brown stated that she filed a grievance, and "after that [Dextrase-Cordova] didn't bother [her]

4

anymore." *Id.* 55:17−23, 56:19−57:5.

In another incident, a charge nurse determined that the only other PCA on duty in unit 4A was scheduled to float to a different unit, and told Brown that she would not get any assistance that night. Brown Dep. 60:5−21. Based on the charge nurse's comment, Brown did not ask the registered nurses on duty that night for help, even though under normal circumstances they would sometimes assist the PCAs as needed. *Id.* 65:15−24. Unit 4A was particularly busy, and Brown's breaks were cut short because she needed to care for patients. *Id.* 60:22−61:5. At her deposition, Brown explained her belief that this incident was related to her race as follows:

> Q: . . . What made you feel that that incident was because of your race?
>
> A:  Because I feel -- no one wanted to help me, and I was the only African American there.  They made sure -- she told me -- she looked in my face, that no one would help me.  So that mean that no one didn't help me because I'm black.  No one.
>
> Q:  Did she say that it was because you were black?
>
> A:  No, she didn't say that.  But I just feel.  No.
>
> Q:  Okay.  Was there any other reason that you felt that incident was because of your race?
>
> A:  No, that's it.

*Id.* 63:17−64:3.

Brown discussed other incidents in less detail.  She said that the nurse manager yelled at her once in front of other employees, who laughed at her. *Id.* 66:8−67:1.  Brown believes this was related to her race because she "feel[s] like" the nurse manager would not do that to another employee. *Id.* 67:17−20.  Brown noted one other incident where a nurse "started yelling at [her] for no reason." *Id.* 69:6−10.  Brown also said that the nursing director never got back to her when Brown tried to arrange a time to voice her concerns, and that she believes that was based on race because it was the nursing director's responsibility to manage the nurses. *Id.*

Perhaps the most troubling incident discussed in the record is an interaction between Brown and a nurse identified only as Tess.  Brown described it at her deposition as follows:

> A:  On October the 17th, 2012, I reported back to my unit, which is 7 o'clock on 4A, this regular nurse RN named Tess, she was asking

5

> where is Rosahili Molher, which is -- which is a coworker.  Why she's not here or -- and as far as she know, what she said, she don't want no African American working here.

*Id.* 71:9−14.  Brown had difficulty discussing this incident.  The parties took multiple breaks off the record and ultimately turned to other issues, returning to the Tess's comment on the second day of Brown's deposition.  *See id.* 71:15−73:25, 89:20−25.  At that point, Brown said that Tess did not supervise any employees, that Tess did not indicate that any other employee agreed with her views, and that Brown did not experience any other harassment by Tess besides this incident. *Id.* at 90:8−19.  Brown stated in her declaration that she has "been continuously subjected to hostile and humiliating conduct and verbal abuse by Filipino supervisors and co-workers who have expressed that they do not want a Black person working among them," Brown Decl. ¶ 12, but she did not identify any other incident where a coworker made this sort of comment, and she stated at her deposition that she discussed all incidents where she was harassed.  *See* Brown Dep. 110:16−18, 111:8−10, 128:18−20.

　　When asked to describe her damages, Brown stated that her experiences at SFGH took a heavy emotional and psychological toll:

> I couldn't eat; I couldn't sleep.  So I went to seek help because it was just too much pressure on me.  Many days I leave work crying. So that's when I seek to get professional help to go talk to a psychiatrist.

*Id.* 112:5−8; *see also* Brown Supp'l Decl. (dkt. 60).  She called in sick approximately forty days as a result of harassment.  Brown Dep. 113:22-24.  She never complained to anyone at SFGH about discrimination or harassment on account of her race, *id.* 76:6−11, but she filed a charge of discrimination with the EEOC on December 20, 2012, Super Decl. Ex. D-1.

　　Brown has never been demoted or disciplined, and has never applied for a promotion or a different position.  Brown Dep. 18:24−19:3, 22:2−5.  She was on medical leave for an extended period until April 14, 2014, and stated that the nurses at SFGH have not harassed her since she returned to work.  *Id.* 126:4−18.

## C.　　Briefing Regarding Defendant's Motion for Summary Judgment

　　Defendant moved for summary judgment on September 26, 2014.  Defendant argues first that conduct before September 11, 2009, including the lock-cutting incident, falls outside of the

United States District Court
Northern District of California

applicable statutes of limitations and thus cannot provide a basis for recovery.  Mot. (dkt. 42) at 7.

Addressing Brown's discrimination claims,[3] Defendant argues that Brown cannot show that she

was subject to an actionable adverse employment action, cannot show a causal link between her

race and the mistreatment she alleges, and cannot show that Defendant's proffered non-

discriminatory explanations for the conduct at issue are pretextual.  *Id.* at 8−13.  With respect to

Brown's retaliation claims, Defendant argues that Brown fails to show that she engaged in any

protected activity, as well as essentially the same arguments regarding Brown's failure to show an

adverse employment action, causal link to race, or that Defendant's proffered justifications were

pretext.  *Id.* at 14−17.  As for the harassment claims, Defendant argues that Brown cannot show

that any harassment was sufficiently severe or pervasive to be actionable, or that it was based on

Brown's race.  *Id.* at 18−19.  Finally, for the § 1981 claim, Defendant argues that it is not liable

under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and that there is no contract

on which to base a claim because public employment in California is by statute rather than by

contract. Mot. at 20−23.

  Opposing the Motion, Brown concedes that she cannot recover for conduct predating

September 11, 2009, but argues that such conduct is "probative historical evidence."  Opp'n (dkt.

47) at 11.  In response to Defendant's arguments that her Title VII and FEHA claims lack

supporting evidence, Brown argues only that "substantial credible evidence in the record" and

"clear evidence on the face of the record" supports her claims, and that Defendant therefore cannot

carry its burden to prevail on summary judgment.  *Id.* at 11−13.  The Opposition does not

specifically identify any evidence in the record.  *See generally id.*  As for the § 1981 claim, Brown

argues that Defendant can be held liable because the conduct at issue "clearly became the official

policy of Defendant which was affirmed, ratified and approved by Defendant" and two of

Defendant's employees.  *Id.* at 14.  Brown also argues that her employment by Defendant

---

[3] Defendant's Motion addresses Brown's corresponding Title VII and FEHA claims together.  This Order follows the same structure of analysis.  *See Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) (holding in a case involving both Title VII and FEHA claims that "we need only assess [the plaintiff's] claim under federal law because Title VII and FEHA operate under the same guiding principles").

constitutes a contract sufficient to support a § 1981 claim, citing the Fifth Circuit's decision in *Adams v. McDougal*, 695 F.2d 104 (5th Cir. 1983). Opp'n at 14−15.

Defendant's Reply primarily restates the arguments in its Motion, but also argues more generally that Brown failed to meet her burden to set forth specific evidence showing a genuine issue for trial. Reply (dkt. 59) at 2−4. Defendant distinguishes *Adams* on the basis that the plaintiff in that case was a political appointee rather than employed by statute. *Id.* at 14−15.

## III.   ANALYSIS

### A.   Legal Standard

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986).

### B.   Brown Identifies No Evidence to Defeat Summary Judgment

Brown's Opposition to Defendant's Motion for Summary Judgment does not identify any evidence whatsoever that supports Brown's claims. *See generally* Opp'n (dkt. 47). It instead presents a narrative "factual summary," *id.* at 6−8, followed by conclusory assertions that each of Defendant's arguments for summary judgment are "contrary to the substantial evidence in the

United States District Court
Northern District of California

8

record," *see, e.g., id.* at 11.  However, "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda."  *S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982).  The Opposition does not include a single citation to evidence in the record.

The deficiency of Brown's Opposition is a sufficient basis to grant summary judgment, regardless of whether the record contains evidence supporting her claims.  In opposing summary judgment, a "party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). "[A] district court has no independent duty 'to scour the record in search of a genuine issue of triable fact,' and may 'rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment' . . . ." *Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1017 (9th Cir. 2010) (quoting *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)).  Brown's allusions to "substantial evidence in the record" and "clear evidence on the face of the record," Opp'n at 12−13, fail to identify any evidence "with reasonable particularity."  *See Simmons*, 609 F.3d at 1017.[4]  Summary judgment is granted on this basis.  In addition, however, the Court has reviewed Brown's deposition and declarations, and finds no evidence presenting a genuine issue of material fact.

## C.    Discrimination Claims

Both Title VII and FEHA prohibit employers from discriminating on the basis of race.  42 U.S.C. § 2000e-2(a); Cal. Gov't Code § 12940(a).  Courts evaluate claims of employment discrimination under Title VII using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The plaintiff must first establish a prima facie case of discrimination.  *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010) (citing *McDonnell Douglas*, 411 U.S. 792).  The burden then shifts to the defendant to articulate a nondiscriminatory reason for its actions, and then back to the plaintiff to show that the proffered

---

[4] Some courts have suggested that this standard may not be fully applicable in cases where a plaintiff is unrepresented.  *E.g.*, *Grant v. Palomares*, No. 2:11-cv-2302 KJM KJN P, 2014 WL 466251, at *6 (E.D. Cal. Feb. 5, 2014).  Here, however, Brown is represented by counsel, and the Court finds no basis to set aside her burden as plaintiff to identify evidence supporting her claims.

United States District Court
Northern District of California

9

reason is "mere pretext for unlawful discrimination." *Id.*

> To establish a prima facie case, plaintiffs must offer evidence that gives rise to an inference of unlawful discrimination. Plaintiffs may establish a prima facie case based on circumstantial evidence by showing: (1) that they are members of a protected class; (2) that they were qualified for their positions and performing their jobs satisfactorily; (3) that they experienced adverse employment actions; and (4) that similarly situated individuals outside their protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.

*Id.* at 1156 (citations, internal quotation marks, and brackets omitted). "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent" and apply the *McDonnell Douglas* standard to FEHA discrimination claims. *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 354−55 (2000); *see also Cheal v. El Camino Hosp.*, 223 Cal. App. 4th 736, 742 (2014).

Here, most of the incidents on which Brown bases her claims do not rise to the level of "adverse employment actions" sufficient to establish the third element of a prima facie case of employment discrimination. The Ninth Circuit defines this term "broadly." *See Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 970 (9th Cir. 2001). Even so, "[n]ot every employment decision amounts to an adverse employment action." *Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000) (quoting *Stroher v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 869 (9th Cir. 1996)) (considering a Title VII retaliation claim). For example, "[b]ecause an employer cannot force employees to socialize with one another, mere ostracism suffered at the hands of coworkers cannot constitute and adverse employment action." *Id.* In order to support a discrimination claim, an employer's action must be "one that 'materially affect[s] the compensation, terms, conditions, or privileges of . . . employment.'" *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (quoting *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1126 (9th Cir. 2000)) (alterations in original).

The Ninth Circuit has "held that assigning more, or more burdensome, work responsibilities is an adverse employment action." *Id.* Here, however, Brown has made no showing that her assignments were more burdensome than those of her coworkers. Brown's

10

claims regarding her work responsibilities include that she was required to float to other units and that she was, on one shift, reassigned from being a "sitter" for a high-risk patient to caring for multiple patients. *See* Brown Dep. 32:22−33:21, 38:19−40:5. There is no evidence in the record, however, that either of these assignments was more difficult or otherwise less desirable than the alternative work, i.e., remaining in unit 4A or serving as a "sitter." Brown in fact alleges that two of her more difficult work experiences occurred while she was working as a sitter (albeit while floating to another unit), *see id.* 34:18−36:18, and on a night where she remained in unit 4A and the other PCA on duty floated to other units, *see id.* 60:5−61:5. In each of those situations, Brown had been given the sort of assignment that in other circumstances she complains of being denied. Brown has therefore not met her burden to show that being assigned to float to other units, or being reassigned out of a "sitter" role, adversely affected "the compensation, terms, conditions, or privileges" or her employment. *See Davis*, 520 F.3d at 1089.

Incidents in which supervisors or coworkers yelled at Brown, while more clearly "adverse" than the assignments discussed above, also do not rise to the level of materially affecting the terms of her employment. Courts have held that "mere oral or written criticism of an employee . . . does not meet the definition of an adverse employment action." *Akers v. County of San Diego*, 95 Cal. App. 4th 1441, 1457 (interpreting FEHA and citing federal appellate opinions interpreting Title VII).[5] The record contains no evidence that Brown was ever criticized in the context of a performance evaluation that could influence her employment prospects going forward. *Cf. id.* (finding that a negative evaluation, coupled with "evidence that the top management demonstrated its willingness to use this information against [the plaintiff] in subsequent employment decisions," could constitute an adverse employment action). Instead, each incident of criticism that Brown discussed appears to have been a verbal exchange with no lasting record or significant consequence. *E.g.*, Brown Dep. 35:7−13, 98:16−18 (testimony that a nurse "threw a piece of

---

[5] The court in *Akers* noted that to the extent Ninth Circuit reached the opposite conclusion in *Brooks*, the *Akers* court found it unpersuasive. *See Akers*, 95 Cal. App. 4th at 1457 n.4. In *Brooks*, the Ninth Circuit recognized that "dissemination of a negative reference" or "issuance of an undeserved negative performance review" could constitute adverse employment actions, but did not address the sort of verbal criticism at issue in this case. *See Brooks*, 299 F.3d at 928.

United States District Court
Northern District of California

paper at" Brown, told her to go to the office, and said he did not like her attitude); *id.* 66:8−67:13 (testimony that a nurse manager raised her voice at Brown, but Brown could not recall what the subject of the confrontation was).

Two incidents may be sufficient to constitute adverse employment actions: the purported denials of holiday pay for Veterans Day in 2012, *id.* 51:1−14, and of sick pay when Brown did not have enough sick time remaining to cover a sick day, *id.* 48:6−49:6.  Incidents that "materially affect . . . compensation" can be adverse employment actions.  *Davis*, 520 F.3d at 1089.  Here, even assuming that Brown's lost pay—which is not quantified in the record—was sufficiently "material" to support a claim, Brown nevertheless cannot identify admissible evidence supporting a conclusion that these incidents were related to her race.

Such a showing can be based either on overtly discriminatory conduct or "direct comparative evidence about how the alleged harasser treated members" of various groups. *See EEOC v. Nat'l Educ. Ass'n, Alaska*, 422 F.3d 840, 844 (9th Cir. 2005) (considering a claim of harassment based on sex, quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80−81 (1998)).  "The ultimate question in either event is whether 'members of one [group] are exposed to disadvantageous terms or conditions of employment to which members of the other [group] are not exposed.'"  *Id.* (quoting *Oncale*, 523 U.S. at 80).

Brown testified that these incidents were based on her race because other employees were paid in similar circumstances.  Brown Dep. 51:25−52:4 (stating that the Veterans Day incident was related to race because "everybody else got paid except me"); *id.* 49:22−50:3 (refusal to grant an exception for sick days was based on race because the supervisor made an exception for another employee).  But in both instances, Brown's belief that other employees were treated differently was based only on what those employees told her.  *Id.* 52:8−12 ("I asked Pat, and . . . [s]he said she got paid."); *id.* 50:14−18 ("Q.  Okay.  How do you know that Mila did that for Maria?  A.  Because she told me.  Q.  Who told you?  A.  Maria.").  These are unsworn out-of-court statements on which Brown relies for the truth of the matter asserted, and as such are inadmissible hearsay.  *See* Fed. R. Evid. 801(c), 802.  The Ninth Circuit has held that a district court abuses its discretion if it relies on testimony that is based on hearsay rather than personal

12

knowledge in evaluating a motion for summary judgment.  *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001).  The Court therefore cannot consider Brown's testimony as to whether other similarly situated non-African American employees were paid for Veterans Day in 2012, or whether other similarly situated non-African American employees were granted exceptions when they did not have sick time accrued to cover necessary absences.[6]  Without that testimony, there is no evidence that Brown's treatment in these two circumstances was based on her race.

Because there is no evidence on which a rational jury could find that Brown experienced an adverse employment action on account of her race, Defendant is entitled to summary judgment as to Brown's discrimination claims under both Title VII and FEHA.

### D.   Retaliation Claims

Both Title VII and FEHA prohibit retaliation against employees for filing a complaint or opposing actions made unlawful under those statutes.  42 U.S.C. § 2000e-3(a); Cal. Gov't Code § 12940(h).  Courts apply the *McDonnell Douglas* burden shifting framework used in considering discrimination claims, except that a plaintiff's prima facie case for a retaliation claim requires showing  "1) that he acted to protect his Title VII rights; 2) that an adverse employment action was thereafter taken against him; and 3) that a causal link existed between the two events."  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004).  California courts apply the same test to workplace retaliation claims under FEHA.  *Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1108–09 (2007).

Here, Brown's only protected activity apparent from the record is filing her EEOC charge. Brown stated at her deposition that she made no other complaints of discrimination:

> Q.  Okay.  So besides [the EEOC charge], have you ever made any other complaints of race discrimination to either San Francisco General Hospital or the City of San Francisco regarding the discrimination that you allegedly experienced at San Francisco General Hospital?
>
> A.  No.  Just -- no.

---

[6] Defendant objects to much of Brown's Declaration for lack of personal knowledge.  *See* dkt. 57. In accordance with *Block*, 253 F.3d at 419, the Court disregards Brown's statements where no basis for personal knowledge is apparent, including statements based on hearsay.

United States District Court
Northern District of California

Brown Dep. 76:6−11.  Brown confirmed later in her deposition that she made no complaints regarding discrimination:

> Q.  Okay.  Regarding retaliation, so what complaints have you made to the city or San Francisco General Hospital regarding race discrimination?
>
> A.  The only one I talked to was my lawyer about it.
>
> Q.  So have you ever made any complaints to the city or the hospital about race discrimination?
>
> A.  No.
>
> Q.  Have you ever made any complaints to the city or the hospital about racial harassment?
>
> A.  No.

*Id.* 131:24−132:9.  All of the incidents of mistreatment that Brown discussed occurred before she filed the EEOC charge.  When asked what she believed Defendant retaliated against her for, Brown stated, "Because I'm black."  *Id.* 76:21.  She confirmed that belief on the second day of her deposition:

> Q: And you felt that what you were retaliated against was for [sic] the color of your skin?
>
> A: Yes.
>
> Q: Is there anything else that you want to add to what you felt you had been retaliated against for?
>
> A: No.

*Id.* 89:14–19.

Mistreatment on account of race—rather than on account of conduct—is governed by state and federal law prohibiting discrimination and discriminatory harassment, but it is not retaliation. A retaliation claim must involve some action taken in response to the plaintiff exercising her legal rights under the statutes, not simply in response to plaintiff belonging to a protected class.  *See* 42 U.S.C. § 2000e-3(a); *McGinest*, 360 F.3d at 1124 (requiring a causal link to the plaintiff's "act[ion] to protect his Title VII rights.").  Because the record contains no evidence that Defendant or its employees retaliated against Brown for engaging in any protected activity, Defendant is entitled to summary judgment on Brown's retaliation claims.

14

United States District Court
Northern District of California

### E.    Harassment Claims

In addition to governing actions that directly impact the terms of a plaintiff's employment, FEHA explicitly prohibits, and Title VII has been construed to prohibit, discriminatory harassment.  *See* Cal. Gov't Code § 12940(j).  "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted); *see also Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 278–79 (2006) (applying the same standard under FEHA).

> To establish a prima facie case of a racially hostile work environment, [a plaintiff must] show that (1) he was a member of a protected class; (2) he was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the [employer] is liable for the harassment.

*Thompson v. City Of Monrovia*, 186 Cal. App. 4th 860, 876 (2010) (applying FEHA and citing federal authority applying the same test to Title VII).  "The working environment must both subjectively and objectively be perceived as abusive."  *Brooks*, 229 F.3d at 923−24 (quoting *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995)).

Here, Brown's claims fail in part for lack of admissible evidence that most of the purported harassment was based on her race —either that it was overtly discriminatory or that employees of other races were treated differently.  *See Nat'l Educ. Ass'n*, 422 F.3d at 844.  When asked at her deposition why she believed the incidents of purported harassment were based on her race, Brown repeatedly stated only, "Because I'm black."  *E.g.*, Brown Dep. 100:20.  She at times said that other employees were treated differently, but generally did not provide any foundation for her personal knowledge of how other employees were treated.  *E.g.*, *id.* 130:6−10 ("MR. OLER: Q. . . . [H]ave your Filipino coworkers been subjected to such actions and conduct?  A.  No.").  When she did state the basis of her beliefs, as previously discussed in the context of holiday pay and sick pay, she cited what she had heard from other employees.  *E.g.*, *id.* 50:14−18.  As discussed above, the Court cannot consider Brown's testimony that is based only on hearsay.  *See Block*, 253 F.3d

United States District Court
Northern District of California

at 419.  The record contains no declarations or depositions of other witnesses, or documentary evidence, to support Brown's assertion that she was treated differently because she is African American.  Most of the conduct of which Brown complains therefore cannot support a harassment claim under Title VII or FEHA because there is no admissible evidence on which a rational jury could conclude that the conduct was based on Brown's race.

There are two exceptions.  First, a connection to race could perhaps be established with respect to Brown's claim that she was required to float to other units months earlier than other employees in her unit.  Brown testified at her deposition that she was able to observe the shift schedules showing that other employees were not required to float.  Brown Dep. 44:2−9.  That testimony could potentially implicate the hearsay exception for records of regularly conducted activities.  *See* Fed. R. Evid. 803(6).  As discussed above, however, Brown has made no showing that floating was more burdensome or otherwise worse in any way than working in unit 4A, and thus cannot support a claim that the requirement to float "exposed [Brown] to disadvantageous terms or conditions of employment," even if she could show that it was based on her race.  *Cf. Nat'l Educ. Ass'n*, 422 F.3d at 844.

The other exception is, of course, the overtly racist comment that Brown attributed to the nurse named Tess, in which Tess "said, she don't want no African American working here." Brown Dep. 71:13–14. [7]  There is no question that this comment was related to Brown's race.  There is also no question that it was bigoted and reprehensible, and that it hurt Brown deeply.  Brown's pain in recounting the incident is palpable from the transcript of her deposition.  *See id.* 71:15−73:25.  In order to support a claim against Brown's employer under Title VII or FEHA, however, Brown's subjective response alone is not sufficient—she must show that her experience was objectively severe enough to support a reasonable belief that it altered the terms and conditions of her employment. *See Brooks*, 229 F.3d at 923−24.

The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788

---

[7] It is not clear whether Defendant would dispute Brown's account of this purported comment at trial, but for the purpose of Defendant's present Motion, the Court takes Brown's account as true.

1    (1998) (citation omitted).  Rather, "conduct must be extreme to amount to a change in the terms

2    and conditions of employment."  *Id.*  Although a workplace need not be "so heavily polluted with

3    discrimination as to destroy completely the emotional and psychological stability of minority

4    group workers" to be actionable, "[c]onduct that is not severe or pervasive enough to create an

5    objectively hostile or abusive work environments—an environment that a reasonable person

6    would find hostile or abusive—is beyond Title VII's purview."  *Harris*, 510 U.S. at 21–22

7    (citation and internal quotation marks omitted).  "To hold her employer liable for [discriminatory]

8    harassment under Title VII, [a plaintiff] must show that she reasonably feared she would be

9    subject to such misconduct in the future because the [employer] encouraged or tolerated [the]

10   harassment."  *Brooks*, 229 F.3d at 924.  As the Ninth Circuit explained in *Brooks*, this standard is

11   difficult to meet based on a single incident:

> Because only the employer can change the terms and conditions of
> employment, an isolated incident of harassment by a co-worker will
> rarely (if ever) give rise to a reasonable fear that [discriminatory]
> harassment has become a permanent feature of the employment
> relationship. By hypothesis, the employer will have had no advance
> notice and therefore cannot have sanctioned the harassment
> beforehand. And, if the employer takes appropriate corrective
> action, it will not have ratified the conduct. In such circumstances, it
> becomes difficult to say that a reasonable victim would feel that the
> terms and conditions of her employment have changed as a result of
> the misconduct.

18   *Id.* (considering sexual harassment claims under Title VII and FEHA).

19        The evidence in the record does not meet this standard.  Brown testified that Tess was

20   speaking only for herself and did not supervise anyone.  Brown Dep. 90:8–15.  Brown also

21   testified that she had no other interactions in which she felt that Tess harassed her.  *Id.* 90:16–19.

22   Although Brown did not specifically discuss whether she reported Tess's comment to anyone at

23   SFGH, she repeatedly testified that she made no complaints of race discrimination other than her

24   EEOC charge.  *See id.* 74:6–76:11.  Under these circumstances, a jury could not rationally find

25   that Tess's racist comment supports an objective belief that "harassment has become a permanent

26   feature of the employment relationship."  *See Brooks*, 229 F.3d at 924.

27        One other incident warrants a brief explanation, because it features prominently in

28   Brown's Complaint.  According to Brown, Nurse Manager Dextrase-Cordova cut Brown's

United States District Court
Northern District of California

17

personal lock off of Brown's locker.  Brown Dep. 54:24–55:23.  Brown concedes that she cannot

recover for this incident due to the statute of limitations, but argues that it constitutes "probative

historical evidence," without further explanation.  Opp'n at 11.  Brown testified at her deposition,

however, that she filed a grievance related to the incident, and "after that [Dextrase-Cordova]

didn't bother [her] anymore." *Id.* 55:17–23, 56:19–57:5.[8]  The Court does not see how the lock-

cutting incident—which does not appear from the record to have been overtly related to race—

could color a jury's perception of subsequent events involving other SFGH employees in any way

that alters the analysis above.

### F.   Claim Under 42 U.S.C. § 1981

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall

have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all

laws and proceedings for the security of persons and property as is enjoyed by white citizens."  42

U.S.C. § 1981(a).  The "contracts" component of the statute "includes the making, performance,

modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and

conditions of the contractual relationship." *Id.* § 1981(b).

#### 1.  Contractual Rights in the Context of Public Employment

Although it is not clear from Brown's Complaint what rights she believes she was denied

as a result of her race, *see* FAC ¶¶ 30-34, her Opposition suggests that this claim is based on her

right to the performance and enjoyment of contractual rights related to her employment. *See*

Opp'n at 14–15.  Defendant argues that as a public employee, Brown has no rights enforceable

under § 1981 because she is employed by statute rather than by contract. *See* Mot. at 22–23.

---

[8] In a subsequent declaration, Brown stated that "Dextrase-Cordova initiated hostile actions and conduct which continued thereafter, publicly displaying [Brown's] personal information, and by communicating with [Brown] in a humiliating and ridiculing manner until [Brown] was compelled to leave work on medical leave from August 1, 2013 to April 14, 2014, to undergo and recover from shoulder surgery."  Brown Decl. ¶ 11.  To the extent that this attributes subsequent actions to Dextrase-Cordova, it conflicts with Brown's earlier deposition testimony that Dextrase-Cordova did not bother her after the lock-cutting incident.  Courts have "held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).  Brown has provided no such explanation here.

United States District Court
Northern District of California

Defendant cites *Judie v. Hamilton*, 872 F.2d 919 (9th Cir. 1989), a case holding that a Washington public employee could not bring a § 1981 claim where Washington law did not vest public employees with contractual expectations in the terms of their employment, and a number of California cases holding that "public employment is not held by contract but by statute" in this state.  Mot. at 22−23 (quoting *Miller v. State*, 18 Cal. 3d 808, 813 (1977)).

The applicable law is more nuanced than either party has briefed.  Judge Hamilton examined this issue in a 2009 decision that both parties should be familiar with, as the defendant was the same as here and the plaintiff was represented by Brown's counsel.  *See Harris v. City and County of San Francisco*, No. C 08-2353 PHI, 2009 WL 2421732, at \*12−13 (N.D. Cal. Aug. 6, 2009)).  As noted in that case, recent decisions by "district courts in this Circuit have held that public employees should not be foreclosed from proceeding with § 1981 claims."  *Id.* at \*12 (collecting authority).  Those decisions rely heavily on the California Supreme Court's recognition in 2003 that public employees enjoy certain contractual expectations in their employment, "including the right of an employee to remain in an office, the right to continuation of civil service status, the right to payment of a salary that has been earned, and the right to retain an accrued pension."  *Id.* (summarizing *White v Davis*, 30 Cal. 4th 528 (2003)); *see also Lukovsky v City and County of San Francisco*, No. C 05-00389 WHA, 2006 WL 436142, at \*2−4 (N.D. Cal., Feb. 21, 2006).  The Court finds the reasoning of these decisions and their interpretation of the California Supreme Court's decision in *White* persuasive,[9] and holds that Brown's status as a public employee does not bar her from pursuing a § 1981 claim.  The Court assumes for the sake of argument that Brown's testimony regarding her denial of sick pay and holiday pay sufficiently establish interference with her contractual rights.

### 2.  Municipal Liability

Defendant is correct that Brown fails to establish city liability for any interference with her

---

[9] The *White* decision in 2003 is more recent than the authority Defendant cites for the proposition that California public employees lack contractual rights.  *See* Mot. at 22 (citing *Shoemaker v. Myers*, 52 Cal. 3d 1, 23−24 (1990); *Miller v. State*, 18 Cal. 3d 808, 813 (1977); *Kim v. Regents of Univ. of Cal.*, 80 Cal. App. 4th 160, 164 (2000); *Kemmerer v. County of Fresno*, 200 Cal. App. 3d 1426, 1432−33 (1988)); Reply at 14 (citing the same cases).

United States District Court
Northern District of California

enjoyment of contractual rights.  Under § 1981, a plaintiff cannot invoke the doctrine of respondeat superior to hold a public entity responsible for the actions of its employees.  *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1215 (9th Cir. 1996).  Instead, the plaintiff must show that the conduct at issue resulted from an official policy, as set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Although *Monell* itself addresses claims under 42 U.S.C. § 1983, the Ninth Circuit applies the same standard to § 1981 claims.  *See African Am. Contractors*, 96 F.3d at 1215.  The "official policy" requirement does not require an *explicit* policy, but can also be met where the conduct is (1) part of a "longstanding practice or custom"; (2) done by someone with "final policymaking authority"; (3) ratified by a final policymaker after the fact; or (4) the result of deliberate indifference.  *Christie v. Iopa*, 176 F.3d 1231, 1235−40 (9th Cir. 1999).

Again, Judge Hamilton's decision in Harris is instructive.  In that case, the plaintiff worked at Laguna Honda Hospital—which, like SFGH, is run by SFDPH—and held a position equivalent to Brown's.  *See Harris*, 2009 WL 2421732, at *1 (stating that Harris "was employed as a Civil Service Class 2302 Certified Nursing Assistant").  In that case, like here, the plaintiff identified no evidence that his harassment was the result of an explicit policy or longstanding custom.  *See id.* at *13.  The plaintiff argued that a nursing director was a final policymaker, but the court held that under state law and the city charter, "the Civil Service Commission ('CSC') is the final policymaker with respect to employment matters."  *Id.* at *14 (citing sections 10.100 and 10.101 of the Charter of the City and County of San Francisco).[10]  Brown has also not produced any evidence that the CSC ratified any decisions regarding her employment, or that it was deliberately indifferent to her treatment.  *See Christie*, 176 F.3d at 1240−41 (holding that "[d]eliberate indifferent is a stringent standard of fault, requiring proof that a municipal actor disregarded a

---

[10] Defendant requests that the Court in this case take judicial notice of certain provisions of the Charter.  Dkt. 42-5.  Brown objects, arguing that the Charter is not relevant to whether Defendant is liable under § 1981.  Dkt. 54.  The Court disagrees.  "The identification of policymaking officials is a question of state law," and "[u]nder California law, a city's Charter determines municipal affairs such as personnel matters."  *Harris*, 2009 WL 2421732, at *14 (citing *Christie*, 176 F.3d at 1235; *Hyland v. Wonder*, 117 F.3d 405, 414 (9th Cir. 1997)).  The Charter is therefore relevant, and the Court takes judicial notice of it as a matter of public record not reasonably subject to dispute.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  known or obvious consequence of its action," and requires something more than a "general policy

2  of delegating discretion" (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997))).

3         Accordingly, for much the same reason as in *Harris*, Defendant is entitled to summary

4  judgment as to Brown's claim under § 1981 because Brown has not identified evidence that any

5  conduct at issue was the result of an official policy.

6  **G.    Motion to Strike**

7         On October 24, 2014, Brown filed a Supplemental Declaration recounting her treatment by

8  a psychotherapist after being "diagnosed with major depression and anxiety."  Brown Supp'l Decl.

9  (dkt. 60).  Defendant moves to strike the Supplemental Declaration as untimely and irrelevant.

10 Mot. to Strike (dkt. 64).  Even if the Court considers the Supplemental Declaration, it provides no

11 basis to deny Defendant's Motion for Summary Judgment.  The Supplemental Declaration is

12 potentially relevant only as to Brown's subjective response to her purported mistreatment.  As

13 discussed above, Brown's subjective experience is not sufficient to support a harassment claim

14 given the lack of evidence supporting an objective belief that discriminatory "harassment ha[d]

15 become a permanent feature of the employment relationship."  *See Brooks*, 229 F.3d at 923−24.

16 Because the Supplemental Declaration has no bearing on the outcome, the Motion to Strike is

17 moot.

18 **IV.   CONCLUSION**

19        For the reasons discussed above, the Court finds that Defendant is entitled to summary

20 judgment as to each of Brown's claims because Brown has not identified sufficient evidence on

21 which a rational jury could find in her favor.  Defendant's Motion for Summary Judgment is

22 therefore GRANTED in its entirety, and the clerk is instructed to enter judgment in favor of

23 Defendant.  Defendant's Motion to Strike is DENIED AS MOOT.

24        **IT IS SO ORDERED.**

25 Dated: November 18, 2014

26                                                    _____

27                                                    JOSEPH C. SPERO
                                                     United States Magistrate Judge

28